**UNITED STATES of America,
Plaintiff,**

v.

**Ronald Leroy McKINLEY; Tony
Gilbert, Jr.; Angelo Fuentes,
Defendants.**

**No. CR.01–291–BR.**

United States District Court,
D. Oregon.

Jan. 30, 2002.

Michael W. Mosman, United States Attorney, Billy J. Williams, Assistant United State Attorney, Portland, for the United States.

Kristin L. Winemiller, Tennyson & Winemiller, Portland, for Defendant Ronald Leroy McKinley.

Steven T. Wax, Federal Public Defender, Ellen Pitcher, Gerald Needham, Assistant Federal Public Defenders, Portland, for Defendant Tony Gilbert, Jr.

James D. Lang, Portland, for Defendant Angelo Fuentes.

## OPINION AND ORDER

BROWN, District Judge.

Defendants Ronald Leroy McKinley, Tony Gilbert, Jr., and Angelo Fuentes are charged in a three-count Indictment with Murder in the First Degree in violation of 18 U.S.C. § 1111, Felony Murder in violation of 18 U.S.C. § 1111, and Robbery in violation of 18 U.S.C. § 2111. The crimes allegedly occurred July 11, 2001, on the Warm Springs Indian Reservation. All Defendants are enrolled members of the Confederated Tribes of the Warm Springs Indian Reservation, and the victim, Michael Saludo, was an Indian male. In the course of a joint homicide investigation by Warm Springs law enforcement authorities and federal agents, Warm Springs police took McKinley into custody pursuant to Warm Springs Tribal Code § 202.335 for "investigative detention" on the morning of Friday, July 13, 2001, and held him at the Warm Springs Correctional Facility (Correctional Facility), which is adjacent to the Warm Springs Police Department (Police Department). The investigators also seized physical evidence in the course of various consent searches.

McKinley moves to suppress the statements he made on July 13 and July 15, 2001, after Warm Springs police detained him. McKinley also seeks to exclude certain physical evidence the investigators seized in the joint investigation.[1] McKinley asserts investigators violated 18 U.S.C. § 3501 when they elicited his statements more than six hours after Warm Springs authorities detained him. McKinley also argues the investigators violated Fed.

1. Gilbert has withdrawn his similar pre-trial motions and notified the Court of his intent to enter a guilty plea. McKinley and Fuentes have moved for separate trials. Their Motions will be addressed in a separate opinion.

R.Crim.P. 5(a) when they failed to take him promptly to a federal magistrate judge for arraignment after his "arrest." McKinley contends these alleged statutory violations tainted his consents to DNA testing, to the search of his bedroom, and to the search of his duffel bag. McKinley also asserts investigators searched his duffel bag before obtaining his consent. Consequently, McKinley also seeks to suppress the following physical evidence: (1) his blue jeans seized from Rosa Chiquito's home pursuant to her oral and written consent; (2) his duffel bag (which contained items belonging to the victim) seized from Chiquito's home and searched pursuant to McKinley's written consent dated July 15, 2001; (3) the blood-stained Nike shoes seized pursuant to a federal search warrant from McKinley's bedroom in his mother's house; and (4) a white, blood-stained T-shirt obtained at the Warm Springs Market based on information gleaned from McKinley's interview on July 15, 2001.

The government denies McKinley was "arrested" for purposes of Rule 5(a) and § 3501 when Warm Springs authorities detained him on July 13, 2001. According to the government, neither Rule 5(a) nor § 3501 were triggered until a federal arrest warrant was served on McKinley the next day, which was Saturday, July 14, 2001. The government contends, therefore, McKinley's statement made on July 13 is not subject to the six-hour limitation of § 3501 because the government had no duty to present McKinley to a federal magistrate judge on July 13. The government also asserts the six-hour limitation does not apply to McKinley's July 15 statement because the government did not unreasonably delay bringing McKinley before a federal magistrate judge for ar-

raignment promptly after the weekend. The government further maintains McKinley's statements were otherwise voluntary, the physical evidence obtained with McKinley's consent is admissible, and the contents of McKinley's duffel bag are also admissible because the bag was not searched until McKinley consented to the search.

For the reasons that follow, McKinley's Motion to Suppress Evidence (# 54) is **DENIED.**

## THE FACTS

The Court conducted an evidentiary hearing on January 10–11, 2002, and heard oral argument on January 15–16, 2002. The events pertinent to McKinley's Motion occurred between the early morning hours of Wednesday, July 11, 2001, when Michael Saludo was murdered, and the following Monday, July 16, 2001, when McKinley was arraigned in the United States District Court in Portland, Oregon, approximately 100 miles from the Warm Springs Indian Reservation. The general sequence of events for purposes of this Motion follows: [2]

### Thursday, July 12, 2001

- Michael Saludo's sister reported him missing to the Police Department around 3:00 a.m. Saludo was last seen early on Wednesday leaving a party with the three Defendants. Saludo was driving his sister's Monte Carlo.

- Jefferson County Sheriff's deputies found Saludo's vehicle in an irrigation canal off the Reservation around 2:30 p.m.

- At approximately 2:50 p.m., Saludo's mother reported she found her son's

---

**2.** The Court has prepared a detailed chronology of the facts it finds pertinent for purposes of this Motion. The Court's Chronology is attached to this Opinion and Order as Exhibit 1.

crutches on the Reservation by Lower Dry Creek campground.

- At 7:00 p.m., Michael Saludo's body was found with multiple stab wounds at the Lower Dry Creek campground.

- By evening, Warm Springs police investigators led by Supervisory Criminal Investigator James Cole (Detective Cole) and federal agents led by Federal Bureau of Investigation (FBI) Special Agent Eric Barnhart were fully engaged in a joint, cooperative homicide investigation that involved all three Defendants, multiple witnesses, and several potential crime scenes.

**Friday, July 13, 2001**

- At approximately 10:30 a.m., Warm Springs police picked up Gilbert and took him to the Police Department where he was interviewed until approximately 1:30 p.m. Gilbert implicated McKinley and Fuentes in the homicide.

- Meanwhile, at approximately 10:43 a.m., another Warm Springs police official picked up McKinley at his residence and took him to the Police Department. At 10:48 a.m., Warm Springs officials confined McKinley in the Correctional Facility for a 24–hour "investigative detention" pursuant to Tribal Code.

- The daily arraignment calendar for the United States District Court commenced at 1:30 p.m. in Portland, approximately 100 miles away.

- Fuentes was taken into custody mid-afternoon for "investigative detention."

- Agent Barnhart and Detective Cole interviewed McKinley at the Police Department from 5:18 to 6:55 p.m. McKinley denied any involvement in Saludo's murder.

**Saturday, July 14, 2001**

- At approximately 10:30 a.m., federal arrest warrants were issued in Portland for McKinley and Fuentes. With the permission of Chief Tribal Judge Lola Sohappy, the arrest warrants were served at the Correctional Facility. McKinley was served at 10:50 a.m.

**Sunday, July 15, 2001**

- At approximately 10:30 a.m., while investigators interviewed Gilbert for the second time, FBI Agent John Shepard contacted McKinley at the Police Department for a polygraph. McKinley confessed to his involvement in the homicide.

**Monday, July 16, 2001**

- All three Defendants were transported from Warm Springs to the United States District Court in Portland and were arraigned.

### *DISCUSSION*

**1. Federal Rule of Criminal Procedure 5(a).**

 Fed.R.Crim.P. 5(a) provides:

[A]n officer making an arrest under a warrant ... or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge....

As noted, McKinley contends he was arrested by 11:00 a.m. on Friday, July 13, 2001. He argues, therefore, the authorities were required to take him before the nearest available federal magistrate judge in Portland, a distance of about 100 miles from the Warm Springs Indian Reservation, for arraignment that afternoon. McKinley further asserts there were adequate police resources and time to allow for his transport to Portland that after-

noon despite the ongoing homicide investigation.

## 2. 18 U.S.C. § 3501.

Section 3501 sets statutory standards for determining the voluntariness of confessions. McKinley challenges the timing of his statements relative to his arraignment, but he does not assert his statements or oral and written consents to search otherwise were involuntary or the product of unlawful police coercion. The Court, therefore, focuses only on the following portions of § 3501 that are pertinent to the issues raised by McKinley in his Motion:

(a) In any criminal prosecution brought by the United States ... a confession ... shall be admissible in evidence if it is voluntarily given....

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including ... the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment....

(c) In any criminal prosecution by the United States ..., a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate ... if such confession is ... made voluntarily ... and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate....

(Emphasis in original.)

Section 3501 creates a six-hour "safe harbor." A confession during this period may not be excluded solely because of delay. *United States v. Van Poyck,* 77 F.3d 285, 288 (9th Cir.1996), *cert. denied,* 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996). A confession that occurs beyond the six-hour safe harbor, however, may be excluded when a delay in bringing the defendant before a federal magistrate judge is unreasonable or when officers intentionally delay processing. *Id.* The defendant bears the burden of establishing a delay was unreasonable under § 3501(c). *See generally United States v. Fouche,* 776 F.2d 1398, 1406 (9th Cir.1985), *overruled on other grounds by California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). As McKinley conceded at oral argument, however, a weekend delay due to the routine unavailability of a federal magistrate judge is reasonable. *Van Poyck,* 77 F.3d at 288–89. *See also United States v. Padilla Mendoza,* 157 F.3d 730 (9th Cir.1998) (no § 3501 violation when defendant questioned 8 hours after arrest, arraigned 25 hours after arrest, crime took place in remote location, and no evidence of improper purpose in delay), *cert. denied,* 525 U.S. 1166, 119 S.Ct. 1084, 143 L.Ed.2d 85 (1999).

## 3. Rule 5(a) and § 3501 apply only to federal arrests.

McKinley argues Rule 5(a) and § 3501 require exclusion of both his July 13 and July 15 statements because each occurred more than six hours after his initial detention by Warm Springs authorities and before he was presented to a federal magistrate judge.

The Federal Rules of Criminal Procedure "govern the procedure in all criminal proceedings in the courts of the United States." F.R.Crim. P. 1. The requirement in Rule 5(a) that an arresting officer take an arrested person "without unnecessary delay before the nearest federal magistrate" judge applies, therefore, only to a person under arrest for a federal crime.

Similarly, the protections afforded by § 3501 only benefit a person under federal arrest. In *United States v. Alvarez–Sanchez*, 511 U.S. 350, 358, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994), the Supreme Court held federal authorities had no duty to comply with § 3501 when a suspect had been arrested on state charges and questioned on federal charges three days after his arrest:

> Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a *federal* offense.... Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under § 3501(c) can occur.

(Emphasis in original.) The Court explained its holding applied even when federal investigators believed, or had reason to believe, the person may also have violated federal law. *Id.* The Court noted the possibility of "improper collaboration between federal and state or local officers," but the Court did not reach the question whether such collaboration might trigger a duty to comply with § 3501. *Id. See also Percy*, 250 F.3d at 725 (when suspect held on tribal charges, court declined to reach issue of application of Sixth Amendment rights under theory that the charges and investigation were "inextricably intertwined" when suspect's rights were validly waived and statements voluntary).

### 4. Only Warm Springs authorities detained McKinley on Friday, July 13.

Indian tribes are quasi-sovereign nations. *United States v. Percy*, 250 F.3d 720, 725 (9th Cir.2001). They exercise "inherent authority" over their members and have the power to regulate "their internal affairs and social relations." *United States v. Headdress*, 953 F.Supp. 1272, 1296 (D.Utah 1996) (citations omitted). "A prosecution under tribal law is not one under federal law." *Id.* An arrest under tribal law, therefore, is not a federal arrest. As noted in *Alvarez–Sanchez*, however, "improper collaboration" between federal and tribal police may trigger the duties mandated by § 3501. 511 U.S. at 359, 114 S.Ct. 1599. Indeed, in *United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir.1988), the Ninth Circuit suppressed a confession because of collusion between tribal police and federal agents who arranged to delay presenting the defendant to a magistrate of the tribal court in which defendant was being prosecuted while a federal agent interviewed him for a related federal investigation. An understanding of how federal and Warm Springs law enforcement authorities worked together in this investigation is, therefore, critical to resolving whether McKinley was in actual or *de facto* federal custody beginning on Friday, July 13, when Warm Springs authorities detained him.

According to both Detective Cole and Agent Barnhart, Warm Springs and federal authorities work cooperatively in the joint investigation of major crimes that take place on the Warm Springs Reservation. Here Detective Cole and Agent Barnhart led the investigation together. Detective Cole directed the activities of Warm Springs police personnel, and Agent Barnhart directed the activities of FBI agents. In fact, it was Detective Cole rather than a federal agent who decided to

detain McKinley pursuant to § 202.335 of the Tribal Code, which provides:

> *Detention Without Bail.* No Indian shall be detained, jailed, or imprisoned except on a non-Tribal warrant for a period longer than twenty-four hours unless there be issued a commitment and detention order bearing the signature of a Judge of the Tribal Court. A Temporary Commitment Order shall be issued for each Indian held for trial and a Final Commitment Order issued for each Indian after sentencing.

According to Detective Cole, this provision authorizes "investigative detention" of a member of the Warm Springs Tribe for up to 24 hours when there is reasonable suspicion that the member has committed a crime. While Detective Cole's interpretation may be open to debate, there is no question Warm Springs police and judicial officials routinely treat this provision as granting such authority. Indeed, in this case, Detective Cole was particularly vigilant about the 24–hour time limit as to both McKinley and Fuentes. On Friday afternoon, Detective Cole sent Speed Memos to the jailers confirming these Defendants were investigative detainees and not otherwise under arrest. In the Speed Memos, Detective Cole noted the specific time of day on Saturday when the 24–hour period would expire. Moreover, Detective Cole had ongoing contact with Chief Judge Lola Sohappy as the deadline approached on Saturday to obtain her authorization to extend the investigative detention if, for some reason, a federal arrest warrant did not arrive in time.

McKinley urges the Court to conclude he was under federal arrest on Friday because Correctional Facility records include a booking form that indicates McKinley was "arrested" on a federal murder charge as of July 13 at 11:00 a.m. The Court, however, gives this evidence no weight. Detective Cole testified there have been problems in the past with the accuracy of booking records at the Correctional Facility. Here it is unclear when and by whom this form actually was prepared. In any event, the form is inconsistent with the behavior of Sergeant Soucie, Detective Cole, and Judge Sohappy. The Court finds Detective Cole entirely credible and, therefore, has no doubt Detective Cole was acting under his good faith interpretation of tribal law when he decided McKinley should be detained for investigative purposes. Under *Arizona v. Evans,* 514 U.S. 1,14–16, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), the good faith exception applies even to warrantless arrests without probable cause. Moreover, because McKinley was not detained pursuant to a directive from any federal investigator, this matter is distinguishable from *United States v. Bear Killer,* 534 F.2d 1253 (8th Cir.1976), on which McKinley relies and in which a federal agent (an officer with the Bureau of Indian Affairs) made the arrest.

Considering the totality of the circumstances, including the absence of any collusion on the part of federal and Warm Springs officials to deprive McKinley of his federal procedural rights, the Court finds McKinley was under arrest by Warm Springs authorities rather than federal authorities as of approximately 10:40 a.m. on Friday, July 13.

**5. McKinley was not under federal arrest for purposes of Rule 5(a) or § 3501 until the federal arrest warrant was served on Saturday, July 14.**

**a. McKinley's expected prosecution in federal court did not convert his detention by Warm Springs authorities into a federal arrest.**

There appears to be no express prohibition against murder in the Warm Springs Tribal Code. Accordingly, McKin-

ley contends he was under federal arrest on July 13 because Warm Springs authorities either would not or could not prosecute him for murder, and it was a virtual certainty the crimes charged in the Indictment would be prosecuted in federal court. A number of other acts implicated in this investigation, such as assault and robbery, are, however, expressly prohibited in the Warm Springs Tribal Code. Warm Springs police clearly had authority under the Tribal Code to conduct an investigation. In any event, even if McKinley's initial detention was unlawful under tribal law as McKinley suggests, his recourse is in Tribal Court because there is no evidence that federal agents unlawfully exploited McKinley's custodial status under tribal law. Indeed, McKinley has not challenged any aspect of the voluntariness of his statements other than their timeliness relative to his arraignment nor has he suggested federal agents exercised any custodial control or authority over him before serving the federal arrest warrant Saturday morning. McKinley's argument, therefore, is unpersuasive.

**b. The likely existence of probable cause to arrest McKinley as of Friday morning did not convert his detention by Warm Springs authorities into a federal arrest.**

■ McKinley asserts there was probable cause to arrest him for the Saludo homicide by the time Warm Springs police detained him Friday morning.[3] According to McKinley, therefore, he effectively was under federal arrest at that point.

In hindsight, the Court concurs there likely was probable cause to arrest McKinley for the murder of Michael Saludo by approximately 10:50 a.m. on the morning of July 13. Although Agent Barnhart was conferring regularly by telephone with Assistant United States Attorney Billy J. Williams concerning the progress of the investigation, the Court finds no federal agent had actually made an affirmative assessment of probable cause as of Friday morning. Agent Barnhart, Detective Cole, and their teams of investigators were working around the clock to gather and to preserve evidence. It was not until late Friday night that Agent Barnhart, in consultation with AUSA Williams, decided it was time to draft a federal complaint against McKinley. Moreover, investigators did not meet to discuss or to assess the evidence accumulated from several witnesses and crime scenes until early on Saturday. Only then did investigators actually determine they had probable cause to seek federal arrest warrants for McKinley and Fuentes.

In any event, the mere existence of probable cause does not require an arrest. In *Hoffa v. U.S.,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Court observed:

> There is no constitutional right to be arrested .... The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause....

Accordingly, the Court concludes McKinley's arrest on Friday morning by Warm

**3.** With his initial Motion to Suppress, McKinley argued he was "arrested" pursuant to Tribal Code without probable cause. *See* Defendant's Memo in Support of Motion to Suppress at 5. At the evidentiary hearing, however, McKinley's counsel contended there was probable cause for McKinley's arrest at the time of his initial detention.

Springs police was not converted to a federal arrest merely because probable cause to arrest him on federal charges may have existed.

## 6. McKinley's procedural rights under Rule 5(a) and § 3501 were triggered when he was served with the federal arrest warrant on Saturday morning.

As noted, a defendant's procedural rights under Rule 5(a) and § 3501 apply only in federal prosecutions. Considering the totality of the circumstances, the Court finds McKinley was first under federal arrest on the morning of Saturday, July 15, after the federal arrest warrant was issued by a federal magistrate judge and served on McKinley at the Correctional Facility. This was the first assertion of any federal control or authority over McKinley. From Friday morning to this point, McKinley was in the sole custody of Warm Springs officials. Accordingly, the Court finds Rule 5(a) and § 3501 do not apply to McKinley's detention on July 13 and the statement elicited from him that evening. The Court also finds federal authorities had no duty to present McKinley to a federal magistrate judge on Friday.

## 7. McKinley's statement of July 15, 2001, and any delay in presenting him to a magistrate judge for arraignment the following Monday did not violate Rule 5(a) and § 3501.

McKinley's statement of July 15, 2001, was made after the six-hour "safe harbor" following his arrest by federal authorities on Saturday. Although McKinley had been in custody since Friday morning and had not been arraigned or obtained appointment of counsel, the Court finds from the totality of the circumstances that McKinley, nevertheless, gave his July 15 statement freely and voluntarily.

Agent Shepard advised McKinley of his *Miranda* rights. McKinley understood his rights and signed a written waiver form. Agent Shepard told McKinley the purpose of the investigation and informed him that he was a suspect in the murder of Michael Saludo. McKinley's handcuffs were removed before the interview, but his leg shackles remained. Agent Shepard conducted the interview in a calm manner without threats or displays of authority. The Court concludes McKinley's inculpatory statements were entirely voluntary.

As previously noted, the government argues the six-hour limitation of § 3501 does not apply to McKinley's July 15 statement because there was no unreasonable delay in bringing him before a federal magistrate judge for arraignment. The Court agrees. McKinley has not met his burden to show unreasonable delay. Indeed, McKinley's counsel acknowledged in argument that a delay occurring over a weekend is reasonable.

Further, the Court finds no evidence of collusion between federal and Warm Springs officials to delay McKinley's presentment to a federal magistrate judge for the purpose of extracting a confession. Thus, this case is distinguishable from the facts in *United States v. Wilson*, 838 F.2d at 1085. *See also Padilla Mendoza*, 157 F.3d at 732 (confession obtained 8 hours after arrest held reasonable absent evidence of deliberate attempt to delay).

## 8. Alternatively, the taking of McKinley's statements on Friday and Sunday and his presentment to a federal magistrate judge on Monday did not violate Rule 5(a) or § 3501 even if he was under federal arrest on Friday morning.

Alternatively, the Court concludes the delay until Monday, July 16, to bring McKinley before a federal magistrate judge was entirely reasonable even if McKinley was under federal arrest Friday

morning because of the distance from the Warm Springs Reservation to Portland and the means of transportation available.

Warm Springs police first picked up McKinley at his mother's residence at approximately 10:40 a.m. on Friday morning.[4] McKinley's first interview with Agent Barnhart and Detective Cole began at about 5:18 p.m., which was within 6.5 hours of his initial detention. As noted, there is no evidence of any bad faith or intent to delay on the part of any of the investigators. Because of the gravity and the evolving course of the investigation as well as the many important tasks the investigators were performing on July 13, the delay in interviewing McKinley was reasonable. In light of the ensuing weekend, it also was reasonable to seek McKinley's voluntary statements on Sunday.

Although McKinley argues it was unreasonable to delay presenting him to a federal magistrate judge until the following Monday, July 16, 2001, it was already 11:00 a.m. on Friday by the time McKinley arrived at the Police Department. The federal investigators knew the daily calendar for custody arraignments at the United States District Court in Portland begins at 1:30 p.m. The distance from Warm Springs Indian Reservation to the nearest federal magistrate judge in Portland is approximately 100 miles. Testimony placed the travel time between these locations at approximately two hours. Thus, even if federal agents immediately stopped their ongoing investigation and diverted at least two agents to transport McKinley to Portland after a formal booking process in Warm Springs, there is no guarantee they would have arrived in Portland in time for an initial appearance. Indeed, the Court concludes McKinley's detention during the day on Friday was reasonable because the still-developing investigation clearly suggested the probable involvement of more than one assailant. The federal arrest warrant for McKinley was obtained promptly from a magistrate judge on Saturday morning, July 14, and all three Defendants were transported to Portland on Monday for the next available federal criminal calendar before Magistrate Judge Stephen M. Bloom at 1:30 p.m.

Considering the totality of the circumstances, including the absence of any collusion or intent to delay by investigators, the Court finds any delay in interviewing McKinley or presenting him to a federal magistrate judge for arraignment was reasonable and, therefore, within the parameters of Rule 5(a) and § 3501.

**9. There is no evidence investigators searched McKinley's duffel bag before he gave his consent.**

■ Warm Springs investigators obtained written consent from Rosa Chiquito to search her residence. Investigators first spotted McKinley's duffel bag in plain view in the living room. A pair of jeans with obvious blood stains was on top of the outside of the bag. The Court finds the investigators properly seized the jeans pursuant to the plain view doctrine. *See Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (warrantless seizure under plain view doctrine applies if officer had a lawful right to be where evidence was sighted and evidentiary value was immediately apparent). Warm Springs Detective Sam Wolfe also seized the bag itself. Detective Wolfe testified the bag was not searched until after McKinley gave his written consent to the

---

4. At this time, Agent Barnhart was interviewing Gilbert, and the FBI Evidence Recovery Team was gathering evidence at the murder scene and other locations. Gilbert's interview lasted until 1:10 p.m. At approximately 2:30 p.m., Fuentes was taken into custody for "investigative detention," and investigators attempted to interview him.

search on July 15. McKinley offered no evidence to refute Detective Wolfe's testimony. In any event, the Court finds Detective Wolfe's testimony credible.

### CONCLUSION

For these reasons, the Court concludes McKinley's statements of July 13 and July 15 were obtained in compliance with Fed. R.Crim.P. 5(a) and 18 U.S.C. § 3501, there is no derivative taint from these statements that would undermine his consents to the physical evidence obtained, and there is no factual basis to support his claim that investigators searched his duffel bag before obtaining his consent. Accordingly, Defendant McKinley's Motion to Suppress Evidence (# 54) is **DENIED** in its entirety.

IT IS SO ORDERED.